Joseph Flood, on behalf of Mark Allen Jenkins, the Petitioner Appellant from the denial of a writ of habeas corpus from the Northern District of Alabama, at table with me is Co-Counsel Ty Alper. May it please the Court, the jury that decided Mark Jenkins' fate was presented with a misleadingly benign and superficial portrayal of who he was and the life that he had up until the point that he committed this lone violent act of his life. That jury did not know that he was an unwanted child who was born premature to a non-marital relationship between his mother and a sailor she met, that he spent the first six weeks in an incubator when his mother had abandoned him at the hospital and put him up for adoption. They didn't learn that when he was brought home he was abused by his mother, who was using drugs, and that she was ashamed of him and hid him in a filthy cupboard underneath the sink. They didn't learn that his stepfather, who was in prison for robbery at the time of his birth, when he was released from prison was horrified that his wife had cheated on him and born a child and thereafter, starting at age three, subjected him to brutality and regular abuse. They didn't learn that at age four, Mr. Jenkins was sexually abused by his grandfather on a hunting trip and that this caused severe psychiatric symptoms, including bedwetting and encrepisis, that his bowel control problems and his bedwetting stimulated increasing amounts of abuse and humiliation. They didn't know that he was neglected and mistreated horribly by his family and that all of the trauma that he suffered in his childhood negatively impacted his development emotionally and psychologically. They didn't realize that at an early age he was diagnosed with psychiatric symptoms, that he was a severely disturbed child who had long-standing depression and was suicidal, that as a teenager he made multiple suicide attempts. They didn't know that he was isolated and scapegoated and that by about age 12, he abandoned his home to avoid the abuse and lived in the street or in juvenile detention the remainder of his teen years. They never learned that he was intellectually limited, learning disabled, and had substantial impairments to his developmental abilities. They didn't know that he was functionally illiterate, had no functional academic ability, and scored in the bottom 1 to 3 percentile in every academic area. They didn't know that despite his genuine efforts to succeed academically, he failed miserably and his teachers from the earliest ages recognized that this work was simply too hard for him. They didn't know that all of this information was cross-corroborated by multiple fact witnesses, family members, friends, and historical records. Despite not knowing any of this, the jury nonetheless recommended a death sentence by the slimmest margin eligible under Alabama law, 10 to 2. Had the jury heard even a fraction of this evidence, there's a reasonable probability that a different result would have happened. With my time today, I would like to focus on two issues. One, the erroneous denial of an evidentiary hearing by the district court, and two, trial counsel's deficient performance that prejudiced Mr. Jenkins at the sentencing phase. In Rule 32, six years before Atkins, Mr. Jenkins presented evidence that supported a finding. It raised an inference, that's the standard under Alabama law in Ray Perkins, that he had an intellectual disability. When Atkins was decided, we promptly briefed the Alabama Court of Criminal Appeals. All of the claims had been denied by the state trial court and the matter was pending on appeal at the time that Atkins was decided. We raised the issue, we asked for several types of relief. First, we asked that the court remand for further proceedings, that it stay the proceedings so that Alabama could adopt the procedure, that Mr. Jenkins be advised about the procedure that would be implemented to prove... My understanding is you did not want a hearing until the legislature had acted. You did not want a hearing on Atkins until the legislature had acted. We certainly requested... I mean, I've read two times your brief and reply brief, and that's what you said. We did say that, but we asked for broader relief. We asked for... I looked for a request for an evidentiary hearing on Atkins without regard to what the legislature might do and I couldn't find anything. Can you point that to me in the brief? Yes. Where can I find it? I believe it's volume 39, tab R56 of 26. Well, where... I'm looking at your supplemental... In the original brief. In your supplemental brief. Yes. I find nothing in there. Can you point to it in the supplemental brief? Page 26. Page 26. I don't see anything on 26. We ask the matter be remanded back to the lower court for further proceedings. That's the broadest type of relief that we could have asked for. Under Alabama law at the time... I understand. I was asking where you said something about an evidentiary hearing and I couldn't find it. We did not specify an evidentiary... Evidentiary hearing. At that time. No, I'm not even in your reply brief. In the supplemental reply, we did not identify an evidentiary hearing. Okay. Well, you asked for... What did you ask for then? Further proceedings. Okay. Under Alabama law at the time and still, further proceedings encompass a broad spectrum of relief, including amending the petition. Yeah. So, under Rule 30... I think I don't have it in front of me, but doesn't Rule 32 state that you get an evidentiary hearing? If you ask for Rule 32 relief, you get an evidentiary hearing, right? If you make allegations that on their face are meritorious, you're entitled to an evidentiary hearing. Does Rule 32 say you're entitled to an evidentiary hearing in that circumstance? Yes. Okay. And the prevailing law at the time would have required that in addition to having an evidentiary hearing, Mr. Jenkins would have had to amend his Rule 32 petition, alleging facts consistent with Atkins, in order to join the issue. We asked for the broadest relief possible in the state... I didn't ask for relief to amend either. I'm sorry. You just asked for a remand. But your main thing was you wanted the legislature to act and you wanted to delay until the legislature acted. I don't agree with that. The main thing we wanted was a remand for further proceedings so we could be in the court that had jurisdiction to hear this issue. The Court of Criminal Appeals does not have jurisdiction over original or amended Rule 32 petitions. In State v. Johnson and State v. Smith, both cases that were remanded for further proceedings, the petitioners in those cases amended their petitions to add the additional claims and there were evidentiary hearings. Anticipating that anything that we omitted would be used against us, we asked for the broadest relief possible. Except you didn't specify anything. The only thing you specified was a stay of the proceedings so the legislature could enact a standard under Act X. That was one form of relief we asked for, Your Honor. Okay. Why don't you go to your next point? Okay. Turning now to the issue about ineffective assistance of counsel. In this case, there were numerous red flags that put counsel on notice that Mr. Jenkins had suffered a horrific childhood, a point that the State essentially concedes in its brief to this Court in which the District Court found. The first red flag was that Jenkins told lead counsel Doug Schofield, who acted as lead counsel throughout the proceedings, that he had suffered as a child, that he had been abused, that his father had been brutal to him, that he had run away and that he had drug problems. Early on in the litigation, defense counsel requested that he be evaluated for competence and insanity. And he was sent to the State Hospital for that evaluation. He spent three months at Taylor Hardin Secure Medical Facility where he was evaluated by a myriad of evaluators. And they filed a report, the Lunacy Commission issued a report almost a year before trial that included many more red flags, including suicidal ideation, depression, anxiety, limited intelligence, limited education. Counsel never requested the nearly 200 pages of records from Taylor Hardin, which I think would be an excellent preliminary starting point because those records contained all kinds of evidence and leads on mitigation that counsel never followed up. In addition to the issues that I outlined at the beginning, there was evidence presented We don't know what counsel did because you didn't call him as a witness. We don't know what Downey did or didn't do because you didn't call him. Your Honor, I respectfully disagree. I think this record is No, no, no. We don't know because you didn't call him as a witness and he was available. We had a sworn fee declaration that has I understand. He spent 170 some hours on the case. No, that's wrong. That's wrong. He spent 71 hours on the case. Oh, 71. That's one of the clearly erroneous things that the state court did. It exaggerated how much work he put in. So you had how many hours he spent, but that's all you know. I don't agree. We know from lead counsel who testified without rebuttal that he had regular meetings with Stan Downey, that he knew what Stan Downey was doing and that Stan Downey did only those We have a sworn fee declaration that has 40 entries of pre-trial work. So Downey was taking instructions from Schofield. Correct.  That's undisputed. Okay. And he filed a very detailed fee declaration. I understand that. Is there anything in the record that explains why Downey was not called to testify? No. Well, the state could have called him to testify. Right. I mean, that's my recollection is that when there are evidentiary hearings on claims of ineffective assistance of counsel, it's normally the state that calls counsel. I think that's absolutely true. We presented overwhelming evidence that there was no investigation done into the mitigation in this case. That wasn't rebutted with argument or evidence. Doug Schofield testified that neither he nor Downey appreciated the significance or what was going to happen at the sentencing hearing. So your argument is the fact that Downey didn't testify cuts against the state and in favor of Mr. Jenkins? Absolutely. You had the burden of proof. And we carried that burden of proof overwhelmingly. In addition to Doug Schofield saying we didn't interview neither Downey or I, family members. It's a rare case, I speak for myself, where the petitioner doesn't call the lawyer who he says was ineffective. And the petitioner gets on the stand and says, here's what I told my lawyer. And the attorney-client privileges waived and all that sort of thing. Well, we did call. We did call lead counsel. No, you didn't call Downey. Downey was the penalty phase lawyer. I understand. For four days. You didn't call him. For four days. No sense arguing about it. You just didn't call him. We did not call him. There's nothing he could have added that would have shown anything. To believe that Downey... There's no evidence that he did anything. And there's overwhelming evidence that he did not do anything. The testimony, the unrebutted testimony of Doug Schofield... Your argument is that the record conclusively shows that he did nothing that Schofield didn't tell him to do. More than that, Your Honor. Schofield was telling him what to do as if he were an associate. That's right. That's what Schofield testified about. We have your point. In addition to that, each of the fact witnesses who testified... Actually, it was Schofield who was ineffective. They were both ineffective. Schofield didn't tell him enough to develop this evidence. That's true. Schofield is the one that was ineffective. Schofield was absolutely ineffective, Your Honor. I understand that because he was controlling Downey. Absolutely. Okay. I understand your point. And the part of this that's so powerful is Schofield testified without rebuttal that about a week prior to the trial is the first time they talked about there being a sentencing phase. And it's at that meeting that he directs Downey to do the penalty phase. And apparently, Downey agrees to do that. And in his fee declaration, there's a notation where they talk about it. It's the only notation out of 40 detailed entries over a nearly two-year period where they discuss it. And even then, he does nothing. He doesn't call a witness. He doesn't call a family member. He doesn't walk across the jail to interview the jail guards. He doesn't request records. He doesn't ask for a continuance. He does absolutely nothing. And the witnesses who testified, family members, friends, and two jail guards says the attorneys did not call us for the purpose of getting mitigation. But you're... So you're separating out sentencing and then guilt phase. But surely you know that this court has approved the reasonableness of pursuing a residual doubt strategy, which means that the jury, who has just heard all of the stuff in the guilt phase, that's still fresh on the jury's mind, and that that's a reasonable strategy. It's only a reasonable strategy if a constitutionally adequate investigation has been done in order to support that strategy. Under Williams v. Taylor, they raised that same issue. And this... There's no evidence that there was a residual doubt strategy except it was manufactured for purposes of appeal. Neither Schofield nor Downey at the sentencing phase raised residual doubt as a defense. There's not a single entry in the fee declaration about that being a defense. He didn't research jury instructions. He didn't point the jury to any facts in the record that would suggest residual doubt. He did nothing. There were two jail guards who came in at Rule 32 to testify about what a good model inmate he was. If there was a residual doubt theory that they were advancing, having jail guards that say he's a good inmate, that he's made an exemplary adjustment to incarceration, would certainly support that, as would the good character evidence that came from all quarters, including Taylor Hardin. There are nearly 200 pages of Taylor Hardin where it says, Mr. Jenkins is pleasant, respectful, cooperative for three months. He never had a single write-up. Even the state's expert, Carl Kirkland, found him pleasant and forthcoming and respectful. If there was a residual doubt theory, which there wasn't, if there was an adequate constitutional investigation, there was no reason not to present this compelling evidence in support of that. But what we have from Downey is talking to the sole witness in the 15 minutes between the guilty verdict and the start of sentencing. It's not contested that he had never spoken to Lonnie Seal. He speaks to him for the first time in that 15-minute interim, but he previously asked Schofield to examine him. He said, you did a good job at trial. Why don't you do this? And Schofield says, get over there and question him. And then what happens at the penalty phase demonstrates there was no preparation and no theory. In his opening statement, which consists of 83 lines of text, only 13 refer to Jenkins or mitigation because there's just none. They've shot themselves in the foot by not doing any investigation, so he's got almost nothing to say. He reads the mitigation statute into the record, 30 lines of text, almost three times as much about mitigation. During the questioning of Lonnie Seal, it's clear he doesn't know anything about Jenkins other than this very brief time that he worked with him in California and the few weeks that he lived with him in Alabama. So unfamiliar is that he doesn't even know how old Jenkins is. At the time of this case, age at the time of the offense was a statutory mitigator, and Mr. Jenkins was 21. Low-hanging fruit. And he asks him, how old is he? And he says, I don't know. And he asks him, if you had a guess, there's an objection. And Lonnie Seal blurts out 25. He gets it wrong because he just doesn't know him. In his summation, which is four and a half pages, 108 lines of text, there are only three lines, 22 words that refer to Mr. Jenkins or mitigation. He spends 121 words, or 17 lines, on the Bible, 71 words, or 11 lines, on news media, and 46 words, 61 lines, or six lines, on Voydier. He had no facts in order to give this jury reasons not to impose the death penalty because there was no investigation done. There was no residual doubt defense. These attorneys were simply inadequate. In the face of that, a jury who had only heard one thing about Mr. Jenkins, that he committed a horrible, brutal crime, still voted 10 to 2 in favor of the death penalty. Under Alabama law at the time, that was the minimum verdict that you could have and still have a death recommendation. What the jury had was this misleadingly benign and superficial image of Mr. Jenkins. But the true story of his life, which is not disputed, Carl Kirkland, the state's expert, conceded that he had a brutal childhood. He was regularly abused and neglected. And this neglect and abuse and the horror of his childhood affected his development, both as a child and as an adult, that he had serious mental illness at a very, very early age. And that is cross-corroborated by the witnesses and the records. They overlooked really easy-to-get information that could have been mitigating in addition to portraying this horrible childhood. The two jail guards who testified said he was a model inmate. One said he was the best inmate he ever supervised. There was excellent, good character evidence. He had no history of violence, no prior history of violence. He didn't have any prior substantial criminal history, which was another statutory mitigator in Alabama at the time. They didn't research that. They were not prepared. And they didn't present that evidence to the jury. They simply ignored the low-hanging fruit in this case. The low-hanging fruit was readily available. Doris Wagner, who testified at the Rule 32 hearing, was more than happy when asked by Taylor Hardin to give information. The Taylor Hardin records show innumerable leads on mitigation. There's names of witnesses that they could talk to, there are contact information, and there are about 20 different mitigating factors that any reasonable attorney would have pursued. But these attorneys didn't even know enough to ask for the Taylor Hardin records, which were in Alabama at the time. They didn't get them, and they didn't pursue that. And it's only because of their lack of experience and ignorance that they didn't pursue this mitigation investigation. Doug Schofield testified about that without rebuttal. He said two things. One, we, Mr. Downey and I, did not appreciate that. And Mr. Downey admitted to him, again without any rebuttal, that he didn't do any investigation. No death sentence can be upheld when there is a constitutionally inadequate investigation and you have a 10-2 verdict where the jury, if given just any amount of mitigation, would have likely voted differently. I'd like to reserve my remaining time for rebuttal. Okay. Mr. Johnson. May it please the Court. My name is Henry Johnson. I represent the respondent in this matter. The State Court's reason will be reasonably found that counsel's performance at the penalty phase was not deficient for at least three reasons. First, as has already been discussed, the petitioner failed to call Stan Downey. We have no idea what was taken by, what was done by Stan Downey or what actions he may or may not have taken. Could the State have called Stan Downey? That's not the State's burden, Your Honor. In the course of the silent record, if there's a silent record, then the But if he conducted a reasonable investigation into Mr. Jenkins' background, certainly that would, the State would want to call him as a witness if they evidence your hearing, wouldn't they? That's not the burden of the State in a Rule 32 proceeding. I know that's not the burden, but it's not unusual for the State to cause, to call counsel to the witness stand, is it? I suppose it's happened. In 17 years, I've never seen it done, Your Honor. But I would point, Your Honor. You've never seen it done in Alabama? In 17 years in Rule 32, I've never seen it done. But I will point, Your Honor, to the fact that even though we don't know from Stan Downey's mouth what he did because he wasn't called. Well, we don't know whether he waived the attorney-client privilege in the first place. That's true, Your Honor. But there are some things. I apologize. He's saying that Schofield was running the show. Schofield was called, so the privilege was waived as to Schofield. We don't know about Downey. Well, we don't know about Downey, and that's absolutely correct. And my friend kept using the word it was unrebutted or unrefuted. Well, it was only unrebutted and unrefuted because Mr. Downey didn't testify. Are the fee vouchers, Mr. Downey's fee vouchers, in the record? They are absolutely in the record, Your Honor. Well, we wouldn't know what he did by looking at his fee voucher, wouldn't we? We do know some things about what he did from looking at his fee voucher, although I will point out that this case is so old, back in 89 and 91, that there was a statutory cap at that time. So we don't know if he put everything down because he exceeded his statutory cap of $1,000 for out-of-court work. So for all we know, he could have done a lot more than 71 hours and not put it down on his form because he wouldn't have been paid for it anyway. But we also know that Schofield testified that there was no strategy that existed at all. They didn't even arrive at any sentencing-phase strategy. Schofield also conceded on cross-examination, however, Your Honor, that he was not aware of what preparations Downey had made for the penalty phase, and when he was asked point-blank on cross-examination, Your Honor, whether he... Okay, so the State's position is, for all we know, he could have conducted a reasonable investigation into his background? Is that the State's position, for all we know? For all we know, because of a silent record. If the record is silent, then Counselor presumed reasonable. That goes back to Strickland v. Washington. The Court of Criminal Appeals went off on the prejudice issue. They certainly did, Your Honor. And we would say that the State... Well, we'll assume that he was ineffective, and so the question becomes what... All that evidence was introduced at the Rule 35 hearing. That's correct, Your Honor. My response to the prejudice issue would be, number one, this was a highly aggravated crime, and number two, the State courts considered that evidence that was presented at the Rule 32 hearing. They found it absolutely incredible, grossly exaggerated, to be contradicted by... Well, let's just take, real quick, four of the witnesses who testified. We've said before, and the Supreme Court has said before, when there is compelling and powerful mitigation evidence that's not presented to the jury during the penalty phase of the case, that could make a difference in established prejudice, haven't we? It certainly could, Judge Wilson, if it was compelling or powerful. Okay, so the State's argument is that the mitigation evidence, in this case, is not compelling and powerful? That's exactly what the State courts found, and this Court, under AEDPA, should find that that State court finding was reasonable. The State Circuit Court witnessed these... had the benefit of observing the demeanor and the testimony of these witnesses and found that they were all incredible. And so, it's a 10-2 verdict, and in Alabama, counsel only needed to persuade one other juror to avoid the death penalty? Well, that would have resulted in the hung jury, at most. I mean, a 9-3 is not proper. They would have needed to persuade six more jurors to get a death without parole sentence. So what would happen if the verdict was 9-3, the recommendation? If the verdict was 9-3, the jury would have been pressed on it twice, and if they continued to come back with 9-3, a new jury would have been impaneled. That's Alabama law. But I think it's important to look at the exact evidence that was presented that my friend has referred to. His grandmother testified, Doris Wagner. She testified that she was unavailable to testify at his trial. His brother, Michael Jenkins, testified that he had no curiosity or concern about what was going on with his brother at the time of this case. His cousin, Tammy Pitts, grossly exaggerated the abuse that he suffered. She contradicted herself, she contradicted other witnesses, and she was found by the state court finder of fact to be incredible. One more, Betty DeLaVega, his cousin who had only seen him twice over the course of his entire life, admitted that she was there solely to get him off death row. And what's key is if all of this abuse happened, there are no records of it. There are no records. My friend would have you believe that this gentleman, Mark Jenkins, went to school every day and soiled clothes. Yet nobody at any school he attended noticed that. There are no records to support the abuse from medical, police, school, otherwise. But interestingly, there are school records showing that he had gingivitis and a rash. That's pretty compelling  that my friend says he has. And that's why the state court found it. The record contains a psychological battery of tests and an opinion from a psychologist when he was 10 years old. Or 12. 12 and 14. That's correct, Your Honor. How did that get into the Rule 32 record? I believe it was... One of them, the IQ was 90. That's correct. And the same test, the IQ was 86. All of them were well over 70. That's correct. He's always had an IQ well over 70. But how did those reports get into the record? It's my understanding the petitioner at the time introduced like 400 or 500 pages worth of records and that those were... And they were buried in there. They were contained in there. So there's evidence supporting the district court's finding that he does not qualify for relief under Adkins. Well, no, that doesn't support a finding that he is not eligible for execution under Adkins. What it supports is that he is competent for trial. That evidence came in not for the purpose of establishing intellectual disability under Adkins, did it? Well, no, Your Honor, because he never had an Adkins hearing and I've certainly conceded that. But it goes to why this court shouldn't remand for an Adkins hearing. Well, it was relevant to Adkins' issue. Of course it's relevant to Adkins' issue because at age 12 and age 14 he was found to have an IQ of 90 or 86 and two separate evaluators, one at age 12 and one at age 14, found that he was of average intelligence. One of whom... A learning disability. Yeah, that he had a learning disability. Dyslexia. That's correct, Your Honor. That's what he was found to have at that age. And then he was evaluated by the Lunacy Commission at Taylor Hardin and three different psychiatrists evaluated him and they came to the conclusion that he was at the time he was evaluated was by Dr. Kirkland at the Rule 32 hearing and Dr. Kirkland found that he had a 76 IQ and was borderline. And their expert agreed. Dr. David Lezak agreed with Dr. Kirkland that Jenkins is borderline. Going back... So, but was there any consideration of the Perkins factors? Well, there was never an opportunity to have that done, Your Honor, because... Well, I take that back. The Court of Criminal Appeals did consider the Perkins factors in 2004 when it affirmed and found that he was not intellectually disabled. To go back to Downey, there are some things we do know. What was his sentencing phase? What was Mr. Downey's sentencing phase strategy? Well, I unfortunately wish I could tell you, but I can't because he wasn't called and so we don't know. But what we can discern from the record... You can't look at the transcript of the penalty proceeding and determine what his sentencing phase strategy was. All you need to do is to look at the evidence that was submitted at the penalty phase and his arguments to the jury to determine what his sentencing phase strategy was. Well, yes, Your Honor, we can do that. And his... As the state courts reasonably found under AEDPA, it was reasonable doubt or residual doubt or lingering doubt or circumstantial evidence and also that Jenkins was a good guy based on the extensive testimony not cursory testimony Was the evidence of his guilt at trial overwhelming? Yes, Your Honor. The state would contend it was. This was a highly... Even the Supreme Alabama Supreme Court said the evidence was overwhelming, didn't it? I believe, if I'm not mistaken, it did. The evidence was overwhelming. All circumstantial evidence, wasn't it? It was all based on circumstances on the testimony that he left the omelet shop with the victim. That is correct, Your Honor, but there were multiple witnesses over the course of the night, two of whom all but identified him at the omelet shop. Well, I'm going to read a sentence from the Alabama Supreme Court Jenkins v. State. The evidence overwhelmingly pointed to the guilt of the appellant. So the evidence was overwhelming, right? The state would agree with the Alabama Supreme Court. Well, it seems crazy to me that you would rely on a residual or reasonable doubt defense if the evidence is overwhelming. That doesn't seem crazy to you? Well, that's a good point, Your Honor. I certainly concede that, but I will also point out that there was a reasonable doubt defense and it was threefold. It was multi-layered. Schofield focused on reasonable doubt as to identity. He focused on reasonable doubt as to insufficient time to commit this crime in the manner that was asserted by the state and, third, insufficient evidence as to the robbery and the kidnapping factors. It seems especially crazy to rely on a residual doubt defense when the evidence was overwhelming, when you got all this compelling and powerful mitigation evidence that wasn't presented to the jury. Well, that goes back to the fact that the state courts reasonably found that that evidence was not compelling or powerful. They found it exaggerated and incredulous. But we could find that that's an unreasonable determination on the facts. I mean, that's what we're here to do, right? You certainly can, Your Honor. But to go back to Downey briefly, it's important to see what we can discern from the record of what he did because there are certain things that he did in fact do. He had at least 10 meetings, as the Court of Criminal Appeals found, and actually I counted 17 meetings with Jenkins at the jail for over 25 hours of discussions. We don't know a word of what they discussed. He was also in contact with Jenkins' grandmother in California, the same woman who testified in Rule 32 that she couldn't testify at his trial. So he may well have known that. And there's another entry, discuss how much to tell his family. So the fact that he was in touch with the family, even if he didn't write down, I spoke with grandmother on this day, although in fact he did write down, I spoke with grandmother on this day, he may have spoken with her on other occasions as well. How do we, speaking of that, how do we deal with the 171-71 discrepancy? That is a good question, Your Honor. And my only thing I can say is I think it's a typo. And again, I would go back to the 71 hours. Again, because he wasn't called, we don't know if it was even 71 hours. Over a two-year period? It was over, well, it was over two and a half years. Not almost two years. That's correct, Your Honor. And he moved for a continuance? He did move for a continuance. So there was more time spent, how long was the continuance? He filed a motion for continuance in October of 1989 and the trial didn't begin until March of 1991. So he had a year and a half. A year and a half of a continuance. That's correct, Your Honor. And there is evidence, as we've said, that you can look at in the fee declaration that he was doing these things, that he was talking with Jenkins, that he was talking with Jenkins' grandmother, that he was talking with Jenkins' family members. And so for all we know, he knew these witnesses. He was considering going to California. That's correct. That was one of the things that he was thinking about doing. But for all we know, he knew about the witnesses who testified in Rule 32. He knew about their wild allegations that the state court found incredible about eating feces and so forth. And he said, I'm not calling these people. And instead, he called Lonnie Seale, who did know him very well. We don't know whether or not he read the lunacy commission's reports. We don't know if he read the lunacy commission's reports. We don't know if he read the lunacy commission's reports. And that's actually an important point to find. That would be reasonably competent assistance if he knew about all this powerful and compelling mitigation evidence and said, no, I'm not going to present that to the jury. Instead, I'm going to rely on a reasonable doubt defense in an overwhelming guilt case. Well, Your Honor... If he did that, he's even more ineffective as counsel. Well, it's quite possible, since we don't know, but that he knew about these allegations from the Rule 32 witnesses and knew they were blunt. And he knew about all this powerful, compelling mitigation evidence and decided not to use it and rely on a reasonable doubt defense in a case where the evidence is overwhelming. If he did that, he's even more incompetent as a federal defense counsel. Your Honor, Judge Wilson, I would say that if that evidence had been found to be compelling and powerful by the state courts, I would concede and throw up my hands. But given that the state courts were there and observed this evidence and found it to be the exact opposite, I can't agree with Your Honor on that. You've talked about, for the mitigation evidence, the childhood investigation that the state court found that the witnesses had exaggerated. What about the other piece of what the other side is arguing is going to be compelling mitigation, the behavior in jail? Can you speak to whether that is, in fact, compelling mitigation evidence? Yes, Your Honor. I would point out that there's a key note in the record, the Taylor-Hardin records, which we don't know whether Downey saw the Taylor-Hardin records or not. But I'd like to cite the court to the record, Volume 25, pages 557 and 572. And the Taylor-Hardin... Pages what? 557 and 572, Your Honor. It's Volume 25. The Taylor- Hardin individuals were informed by the chief jailer of the county, whose name was Alton Fuller, that Jenkins can appear violent and start cursing. So and can appear moody, among other things. But the key words I would take out were, Chief Jailer Alton Fuller in the Taylor-Hardin records said that he was violent and cursing. So if they had called the witnesses that they said they should have called, would the state not have called Chief Jailer Alton Fuller to say, oh no, he wasn't a great person? We have to assume they would have called. In weighing the prejudice issue, we have to assume that all of that evidence was favorable to the defendant and unfavorable, including cross-examination was in the before the jury. Yes, Your Honor, we do. And again, we unfortunately don't know if Downey looked at the Taylor-Hardin records. I assume he did. The record is silent, so we have to presume he did. But assuming he did, he may well have seen Chief Jailer Alton Fuller's report and said, I'm not going to call. I'm not going to get anywhere near these jailers. And that would have been a reasonable decision on his part. If there are no further questions, I'm happy to rest on my brief and ask this Court to affirm the judgment of the District Court. Mr. Floyd? Thank you, Your Honor. I think the prism of this evaluation, you put your finger on it, which is that both attorneys were deficient. Schofield was deficient in a prejudicial way because he didn't appreciate what mitigation was, and therefore he did no investigation. Counsel, let me say this. We don't know whether or not the Taylor-Hardin records were read. We just don't know. We do know. How do you know they were not read? Schofield testified about that in Rule 32. He doesn't know whether Downey looked at them. He said they never collected the Taylor-Hardin records. He said we never reviewed those. We have the detailed fee declaration that goes down to the minute. The report was produced to the Court. A five-page report. Superficial report. I understand that. We don't know whether they talked to the doctors or not. I think we do. Where in the record has it shown that they didn't talk to any of the doctors? Schofield testified that they didn't. He doesn't know what Downing did? I believe he did. Okay, your position is that this record is going to show as a matter of fact conclusively that Downing didn't do anything that Schofield didn't tell him to do and since Schofield didn't tell him to talk to the doctors or anybody else he didn't do it. That's your position. Not exactly. My position That's the way I read it, Counsel. Either that way or we don't know what Downing did. We have witnesses who said the attorneys did not contact them. Do you have any of the experts that were in Taylor Harden that those doctors that testified that they didn't testify. They submitted a report. We don't know whether they talked to them. The Taylor Harden records No, no, no. I'm talking about The Taylor Harden records contain correspondence from Taylor Harden to Mr. Schofield and Mr. Downing saying we're doing an evaluation. If you have information. I understand. After the evaluation we don't know. No. During the evaluation, they were doing a competence evaluation and they solicited Doug Schofield and Stan Downing to provide information. I understand that. My question is after it was done and they reached their opinions. Correct. Doug Schofield What does the record tell us? Doug Schofield says I did not review the records. Okay. And we don't know about and so Downing didn't because he didn't tell Downing to do it. Isn't that your point? And Downing who kept a very detailed fee declaration. Everything the government is saying is evidence. It's pure speculation. Attorneys testify for the Attorney General all the time. I was called as an expert witness in a Rule 32 hearing not two years ago when the Attorney General called counsel to rebut the allegation of ineffective assistance of counsel. Stan Downing was readily available for them and if there was rebuttal, I presume that they would have presented it. But what went in without rebuttal was that Doug Schofield took responsibility for the entire case until four days before the sentencing hearing and that they did none of this. It is documented. We have the witnesses who said no one called us including the jail guards who were right across the street and they had contact with. Okay. It's very, very clear that Mr. Downing didn't do anything even after those four days. He told Schofield, and this is in the record, that he didn't do anything before that and his performance at the sentencing phase is clear that he didn't do anything. For all those reasons, we would ask the court... Let me ask you before you sit down I'm curious to know your response to the state's argument that, well, Downing could have done more we just don't know. There was a fee cap, so he just didn't put it on his expense voucher what he did. Well, he went over the fee cap. That demonstrates he's oblivious to the fee cap and he's documenting everything. I've never seen a fee declaration so detailed. There are 40 entries down to five minute increments. There's one, the conversation he had with Ms. Wagner that happened on October 18th. It's clear it's about a guilt phase issue. It's about an identification that was made. It was 12 minutes long. You can exceed the fee cap with a request, right? That's right, and they could have done that, but the fact that he didn't stop keeping track of it when he met the fee cap confirms that he's keeping copious notes about what he's doing. There are numerous references in here into the meetings that he had with Mr. Jenkins when lead counsel was present. 13 hours. I counted them last night. There were five meetings comprising 13 hours, and Schofield testified we didn't talk about mitigation. So the speculation that maybe all these conversations were happening about mitigation, Schofield says that's not true. But even if it was true, you would presume that after learning about this, if they were providing constitutionally adequate representation, they would then seek records. There's not a single reference in this fee declaration to requesting historical records. These were easy to get. The Taylor-Hardin records make references to mitigation witnesses and other records that they could have pursued. They didn't request or review the Taylor-Hardin records. They didn't ask for his birth records, his school records, his juvenile delinquency records, the Department of Social Service records. All of those things were introduced by the petitioner in Rule 32 and corroborate what the witnesses said. There were inconsistencies. Tell me about the relevancy of the testing when he was 12 and 14 years of age. We submit that those are not IQ tests. They were screening inventories that were done in a group setting. They're not legitimate tests. They're not the WACE. They're not the Stanford-Binet. Was that shown? That's shown in the Rule 32 hearing. No, that was not an issue. That's coming out of you. You said they're not valuable. That's right. But the state did not... We'll accept your testimony, Mr. Flood. The Court of Criminal Appeals, however, did not rely on those in rejecting our showing of the IQ. Under Wilson v. Sellers, we don't look through what the court said to find better reasons. This wasn't raised by the state before, and so there was no reason to address this, okay? But Wilson v. Sellers says when there is a reason given by the state... The state had it in its brief, and you didn't respond in a reply brief. I think we said Wilson v. Sellers says you can't review that. They're doing this all the time. They're speculating about evidence... Well, the district judge cited it. But the state... We're reviewing the state court when it was unreasonable. The district judge cited it as evidence in the Rule 32 hearing. Okay. That's where I found it. That's right. But the state court did not rely on that. Wilson v. Sellers says you limit yourself to the decision reached by the state court, and they rejected the IQ because it wasn't below 70, even though under clinical standards at the time that IQ was sufficient. We understand your argument. Thank you, Your Honor. Court will be in recess under the usual order. All rise. Thank you.